## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

SHAKEEB AHMED,

Defendant.

23 Cr. 340 (VM)

## DEFENDANT SHAKEEB AHMED'S SENTENCING MEMORANDUM

Bradley J. Bondi
Sara E. Ortiz
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 318-6920

*Counsel for Defendant Shakeeb Ahmed*

**TABLE OF CONTENTS**

Page

I.      PRELIMINARY STATEMENT ..................................................................... 1

II.     SHAKEEB'S BACKGROUND ...................................................................... 2

        A.      Shakeeb's Harsh Childhood Environment in Saudi Arabia.................................. 2

        B.      Shakeeb's Move and Assimilation to the United States. ....................................... 4

        C.      Shakeeb's Professional Life........................................................................ 5

        D.      July 2022 Hacks.................................................................................... 7

III.    THE OFFENSE CONDUCT .......................................................................... 9

IV.     THE PRESENTENCE REPORT'S ADVISORY GUIDELINES
        CALCULATION AND BELOW-GUIDELINES RECOMMENDATION................... 10

V.      SENTENCING ANALYSIS............................................................................ 11

        A.      The Nature and Circumstances of the Offense Justify a
                Noncustodial Sentence Under Section 3553(a)(1).................................... 14

        B.      Shakeeb's Personal History and Characteristics Justify a
                Noncustodial Sentence Under Section 3553(a)(1).................................... 16

                1.      Shakeeb's Extraordinary Acceptance of Responsibility,
                        Including His Voluntary Disclosure of the Nirvana Hack
                        Because He Believed Someone Else Was Wrongfully
                        Accused, Warrants a Noncustodial Sentence.............................. 17

                2.      The Two Hacks in July 2022 Were Anomalous Events in
                        an Otherwise Exemplary and Law-Abiding Life......................... 18

        C.      A Custodial Sentence Is Not Necessary To Achieve the Objectives
                of Section 3553(a)(2). .................................................................. 23

                1.      Applying Section 3553(a)(2)(A), a Noncustodial Sentence
                        Would Reflect the Seriousness of the Offense, Promote
                        Respect for the Law, and Provide Just Punishment for the
                        Offense. ...................................................................... 23

                2.      Applying Section 3553(a)(2)(B), a Noncustodial Sentence
                        Would Afford Adequate Deterrence to Criminal Conduct. ......... 25

                3.      Applying Section 3553(a)(2)(C), a Custodial Sentence Is
                        Unnecessary To Protect the Public. ..................................... 30

                4.      Applying Section 3553(a)(2)(D), a Noncustodial Sentence
                        Would Provide Shakeeb With Needed Mental Health Care........ 30

        D.      A Non-Custodial Sentence Is Available Under 18 U.S.C. §
                3553(a)(3). ............................................................................ 32

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

E.      A Noncustodial Sentence Would Avoid Unwarranted Sentencing
        Disparities Under Section 3553 (a)(6). ..................................................... 32

F.      Shakeeb Already Has Satisfied His Restitution Obligations to the
        Victims Under Section 3553 (a)(7)........................................................... 37

VI.     CONCLUSION ..................................................................................................... 37

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007)................................................................................................12, 16

*Kimbrough v. United States*,
    552 U.S. 85 (2007)....................................................................................................12

*Pepper v. United States*,
    562 U.S. 476 (2011)..................................................................................................30

*United States v. Alatsas*,
    No. 06 Cr. 473 (JBW), 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008).....................27

*United States v. Algahaim*,
    842 F.3d 796, 800 (2d Cir. 2016) .........................................................................15

*United States v. Bannister*,
    786 F. Supp. 2d 617 (E.D.N.Y. 2011) ...................................................................25

*United States v. Booker*,
    543 U.S. 220 (2005)..................................................................................................12

*United States v. Broxmeyer*,
    699 F.3d 265 (2d Cir. 2012)....................................................................................17

*United States v. Doe*,
    323 F. Supp. 3d 368 (E.D.N.Y. 2018) ...................................................................27

*United States v. Forrester*,
    21 Cr. 682 (VM) (S.D.N.Y. 2023) ...................................................................23, 36

*United States v. Harris*,
    No. 16 Cr. 851 (VSB), 2020 U.S. Dist. LEXIS 145442 (S.D.N.Y. Aug. 12, 2020)...............22

*United States v. Hendrix*,
    505 F.2d 1233 (2d Cir. 1974)..................................................................................27

*United States v. McCarthy,*
    No. 22 Cr. 491 (NRM), 2023 WL 3741996 (E.D.N.Y. May 30, 2023).................26

*United States v. Mears*,
    758 F. App'x 92 (2d Cir. 2018) ..............................................................................16

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

*United States v. Mitrow*,
  No. 13 Cr. 633 (PAE), 2015 WL 5245281 (S.D.N.Y. Sept. 8, 2015)...............................16, 23

*United States v. Rodriguez*,
  No. 20 Cr 398 (GBD) (S.D.N.Y. 2023) .................................................................................15

*United States v. Thompson*,
  No. 19 Cr. 959 (RSL) (W.D. Wash. 2022) .......................................................................32, 36

*United States v. Petrelli*,
  306 F. Supp. 2d 449 (S.D.N.Y. 2004)....................................................................................18

*United States v. Rivera*,
  262 F. Supp. 2d 313 (S.D.N.Y. 2003)....................................................................................18

*United States v. Qin*,
  No. 21 Cr. 75 (VEC) (S.D.N.Y. 2021) ...................................................................................35

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009).....................................................................................................24

*United States v. Thavaraja*,
  740 F.3d 253 (2d Cir. 2014)...................................................................................................12

*United States v. Velazquez*,
  No. 16 Cr. 233 (AKH), 2017 WL 2782037 (S.D.N.Y. May 26, 2017) ................................25

*United States v. Villella*,
  No. 07 Cr. 287 (RWS), 2007 U.S. Dist. LEXIS 72712 (S.D.N.Y. Sep. 25, 2007)................27

*United States v. Zaslavskiy*,
  No. 17 Cr. 647 (RJD) (RER) (E.D.N.Y. Nov. 18, 2019)........................................................15

*United States v. Zhong*,
  22 Cr. 606 (PGG) (S.D.N.Y. 2023) ...........................................................................33, 34, 36

**Statutes**

18 U.S.C.

  § 1030........................................................................................................................32
  § 1030(a)(4) ..............................................................................................................10
  § 1030(c)(3)(A)..........................................................................................................10
  § 3553(a) .............................................................................................................*passim*
  § 3553(a)(1) ........................................................................................................*passim*
  § 3553(a)(2) ......................................................................................................14, 27
  § 3553(a)(2)(A)..........................................................................................................23
  § 3553(a)(2)(B)..........................................................................................................25

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

§ 3553(a)(2)(C) ...................................................................................................30
§ 3553(a)(2)(D) ...................................................................................................30
§ 3553(a)(3) ..................................................................................................14, 32
§ 3553(a)(6) ..................................................................................................14, 32
§ 3553(a)(7) ..................................................................................................14, 37
§ 3663A ..............................................................................................................11

21 U.S.C. 853(p) ...................................................................................................12

Defendant Shakeeb Ahmed, through counsel, respectfully submits this Sentencing Memorandum in advance of his sentencing, scheduled for April 12, 2024.

## I.    PRELIMINARY STATEMENT

For Shakeeb Ahmed, a young computer engineer, computers always represented a safe space—a means of escape from a physically and verbally abusive household, depression, isolation, and insecurity.  Shakeeb studied computer engineering in school, earned a living as a computer engineer, and, through that work, found a sense of belonging and confidence in the professional world.  In July 2022, Shakeeb's interest in computers also led him to make the biggest mistake of his life—a mistake he deeply regrets and for which he has accepted responsibility and endeavored to make amends.

The two hacks that Shakeeb conducted, both of which took place during a three-week period in July 2022, at a time when Shakeeb's mental health was greatly suffering—are complete anomalies in the context of an otherwise exemplar, law-abiding life.  Shakeeb immediately regretted what he had done.  Besides using a small amount of the crypto tokens to pay for a medical procedure for his sibling (who was unaware of the hack), and as collateral for a loan,[1] Shakeeb did not spend any of the crypto tokens that he took, and he already has transferred 100% of the crypto tokens to the government as expected restitution.  Before Shakeeb was even arrested, he began seeking counseling to get help for the mental health and substance abuse issues that led him to make the worst decision of his life.  After Shakeeb's arrest, he not only pleaded guilty early, but voluntarily disclosed the second hack, even though there was no indication that the hack was being investigated, and where it appeared that someone else was being wrongly accused of committing

---

[1] The crypto tokens that served as collateral for a $10,000 loan also was returned to the government.  Because a portion of these crypto tokens were "staked" or locked in the protocol, Shakeeb paid out of pocket to deposit additional cryptocurrency into the protocol to unlock the crypto tokens and return it to the government.

the hack.  Shakeeb's acceptance of responsibility in this case has been extraordinary and is demonstrative of Shakeeb's deep remorse for his actions.

For these reasons, and for the reasons set forth below, we respectfully ask the Court to impose a sentence of probation, which will allow Shakeeb to continue receiving mental health treatment from his therapist, and to enlist the strong support of his family and friends to aid him in his rehabilitation.  Notwithstanding the **Probation Office's ("Probation") below-Guidelines recommendation of 24 months imprisonment**, we submit that a noncustodial sentence is consistent with applicable law and precedent, and serves the goals of rehabilitation and deterrence.

## II.    SHAKEEB'S BACKGROUND

### A.    Shakeeb's Harsh Childhood Environment in Saudi Arabia.

Shakeeb is 34 years old, and was born in Jeddah, Saudi Arabia to parents who had emigrated from India.  Presentence Investigative Report ("PSR"), Dkt. No. 38 (S.D.N.Y. Mar. 18, 2024) at ¶ 72.  Shakeeb is the second youngest of five siblings:  He has two older brothers, an older sister, and a younger brother.  Shakeeb spent his early years in Jeddah with his parents and four siblings.  He was a gentle child who "never got into any kind of trouble" and "kept to himself and was very quiet."  Letter from Zehra Ahmed ("Zehra Ltr.") at 1, Ex. A-2.  Shakeeb was raised in a strict and conservative Muslim household.  "There was an exorbitant amount of pressure from a young age to academically perform and receive approval from his parents[,]" and "[h]e was expected to follow their strict, conservative cultural and religious rules."  Letter from Therapist Priti H. Doshi, LP ("Therapist Doshi Ltr.") at 1, Ex. A-5.

Shakeeb's father and oldest brother, who still lives in Saudi Arabia, both physically and verbally abused Shakeeb.  "He reported incidents where his father would hit him, and yell at him and his siblings if they didn't practice and follow his traditional teachings."  Therapist Doshi Ltr. at 1, Ex. A-5; *see also* PSR at ¶ 74.  His sister, Zehra, writes that their childhood was "unfortunately

not a happy one," and describes how their "father, who was in construction management, worked very hard to provide for his family, but would fly into a rage over minor annoyances several times a week due to the pressure he was under." Zehra Ltr. at 1, Ex. A-2. Zehra also recalls that "[a]s children, we experienced this environment as tumultuous and frightening, and would often retreat to our rooms when our father was home." *Id.* Ms. Doshi similarly writes that Shakeeb "was isolated and alone as a child and a young adult." Therapist Doshi Ltr. at 1, Ex. A-5.

Shakeeb's therapist Priti H. Doshi also reports that "Shakeeb was terrified of his father and didn't feel protected by his mother. His mother would witness these outbursts without intervening." *Id.* Zehra similarly feels that their "mother, although loving, had married young and was too distracted by her own challenges to give her children (particularly Shakeeb, as the fourth child) the sort of close, nurturing attention they needed to thrive." Zehra Ltr. at 1, Ex. A-2. Shakeeb's therapist observes that "[l]iving in fear of being punished and criticized, and having no external caregiver to protect and nurture him, Shakeeb learned to hide his feelings of helplessness and not being good enough." Therapist Doshi Ltr. at 1, Ex. A-5.

Shakeeb became interested in computers at an early age "to cope with these circumstances." Zehra Ltr. at 1, Ex. A-2. "To find comfort and a sense of agency, [Shakeeb] would turn to his computer to connect with the outside world and technology, because it was an area of deep interest, but also a way to escape from the chaos and pressure." Therapist Doshi Ltr. at 1, Ex. A-5. As Shakeeb grew older, his sister describes him as an "unusually silent, but extremely self-reliant preteen." Shakeeb taught himself to code and found a community online, and by the age of fourteen, he was running a successful web design business. Zehra Ltr. at 1, Ex. A-2. Zehra writes that she "was proud of him, not realizing at the time that Shakeeb's admirable

self-sufficiency was linked to the conditions of his upbringing.  Faced with a lack of predictability and adults who understood him, it made sense to him to do everything on his own."  *Id.*

**B.**  **Shakeeb's Move and Assimilation to the United States.**

In August 2005, when Shakeeb was 15 years old, he had the opportunity to move to the United States and live with his uncle and his family in Louisville, Kentucky to finish high school. Shakeeb took this offer as his chance to flee from the abuse to which he was subjected in his family home in Saudi Arabia, and moved to the United States.  There, he became close with his cousin, Hibah Mahi, with whom he lived and attended high school.  Hibah recalls that, Shakeeb "was committed to working hard to build a successful future for himself.  He worked quietly and diligently in school" and "was not one who complained about anything."  Letter from Hibah Mahi ("Hibah Ltr.") at 1, Ex. A-8.

Although Shakeeb was no longer the subject of verbal and physical abuse, his transition from life in Saudi Arabia to the United States was not easy, culturally or otherwise.  As Charles Cui, Shakeeb's high school friend, stated, "[i]t was difficult for him to transition to life in the United States after living in Saudi Arabia," especially considering the "culture in the United States at that time was still apprehensive about people from the Middle East" after the events of September 11, 2001.  Letter from Charles Cui, ("Charles Ltr.") at 1, Ex. A-3.  As a teenager in a new country, far away from his family and friends, Shakeeb again turned to "his computer to deal with his loneliness and sense of not belonging, as well as his isolation and despair."  Therapist Doshi Ltr. at 2, Ex. A-5.  Hibah recalls that during this time, "Shakeeb could often be found playing video games or tinkering with some gadget or another. His curiosity about how electronics work stood out to me, since I had not yet seen how someone could exhibit so much focus and determination at such a young age."  Hibah Ltr. at 1, Ex. A-8.

Shakeeb subsequently attended college at the University of Illinois.  Shakeeb's parents expected Shakeeb to both excel academically and financially support his family in Saudi Arabia. Therapist Doshi Ltr. at 2, Ex. A-5.  Wanting to meet his parents' high expectations and also pursue his passion for computers, Shakeeb initially majored in both premed and engineering.  *Id*.  By the time Shakeeb was a sophomore, however, the high academic and familial pressures, "without any support systems led Shakeeb to spiral into isolation and depression."  *Id*.  "Living by himself for the first time, he suffered from culture shock and felt unequipped to navigate college life.  He coped by spending much of his time alone in his room with his computer." Zehra Ltr. at 1, Ex. A-2.

After Shakeeb's academic advisor told Shakeeb that he was at risk of failing out of school, Shakeeb sought the help of a therapist, who he visited twice per week to treat his depression.  *See* PSR at ¶ 83.  Shakeeb worked hard to better himself, improve his mental health, and successfully got his grades and studies back on track.  Shakeeb also made the difficult decision to forgo additional premed studies and to focus solely on computer engineering.  Shakeeb's decision to pursue engineering over premed was "devastating" for his parents, and it led to Shakeeb being further ostracized and abandoned by them.  Therapist Doshi Ltr. at 2, Ex. A-5.  Shakeeb ultimately graduated college in 2011 with a Bachelor of Science degree in computer engineering.

C.    **Shakeeb's Professional Life.**

Shakeeb has worked as a software and computer security engineer since beginning his professional career.  After graduating from college in 2011, Shakeeb worked as a software engineer for a global firm based in Illinois.  In 2015, Shakeeb moved to New York City to work for the cybersecurity company, Red Balloon.  The culture at Red Balloon was "work hard, play hard," *see* Therapist Doshi Ltr. at 2, Ex. A-5, and Shakeeb regularly worked 80 or more hours per week.  *See* Letter from Rick Housley ("Rick Ltr.") at 1, Exhibit A-6 ("Weeks of 2am nights followed by

Friday evening barbecues were not uncommon.").   During this time, Shakeeb began developing a dependency on substances to cope with his stress.   *See* Therapist Doshi Ltr. at 2, Ex. A-5 ("To release stress and tension and to deal with his long history of not fitting in, [Shakeeb] began" his substance abuse and continued to abuse substance "throughout the week and daily to deal with the pressure to perform.").   After four years at Red Balloon, and searching for additional opportunities to advance his career, Shakeeb moved to another cybersecurity company.  He worked remotely for that company for a year and eight months.

In November 2020, Amazon hired Shakeeb to work remotely as a senior security engineer. One of Shakeeb's responsibilities included being the technical lead of Amazon's "bug bounty" program.  "Bug bounty" programs, which are increasingly common in technology companies, provide a monetary reward to hackers for successfully discovering and reporting a vulnerability or bug to the application's developer.  Bug bounty programs allow companies to leverage the hacker community to improve their systems' security protocols.  Shakeeb reviewed these reports, repaired the security vulnerability that had been identified by the hacker, and helped to determine the amount of the bounty that Amazon would pay the hacker.

Beginning in 2020, Shakeeb became deeply depressed as a result of the isolation that he experienced with COVID lockdowns and completely remote work.  Shakeeb's sister observed that "[t]he onset of the pandemic in 2020 reinforced Shakeeb's sense of isolation.  He was working remotely full-time, and had lost the sense of shared challenge that connected him to his colleagues in his previous job.  He was still carrying around a great deal of baggage and unprocessed trauma from his childhood in Saudi Arabia."   Zehra Ltr. at 2, Ex. A-2.  Shakeeb's depression continued and escalated to a breaking point during the summer of 2022.

### D.     July 2022 Hacks.

Isolated and severely depressed, Shakeeb turned to the cryptocurrency space, which was intellectually stimulating and changing by the day, and offered Shakeeb a sense of community with like-minded people that was lacking in his life.  Shakeeb witnessed frequent hacks on cryptocurrency smart contracts, or protocols, and these hacks made the protocols stronger in the long run, like the hacks he encountered in the bug bounty program at Amazon.  Shakeeb believed that he found a vulnerability in the code for a decentralized protocol, the "Crypto Exchange," that would allow him to extract tokens from the protocol.  Shakeeb saw this vulnerability as a technical challenge to be solved.  On July 2, 2022, a short time after discovering this vulnerability, Shakeeb extracted approximately $9 million in crypto tokens from the Crypto Exchange.  PSR at ¶ 22.

On July 3, 2022, the Crypto Exchange initiated public communications on the blockchain with the unidentified "hacker," Shakeeb, and offered to pay a bug bounty of $800,000 for the return of all the crypto tokens.  *Id*. at ¶ 25.  After completing the hack, and surprised that it had worked, Shakeeb initially panicked.  As his search history reveals, on July 5, Shakeeb ran approximately 70 searches for white collar law firms.  *Id*. at ¶ 30.  The same day, he also researched white hat bounties that were awarded in other hacks.  *Id*. at ¶¶ 29–30 (Shakeeb "visited an online news article with the title, 'Why Expensive Crypto Hacks Are The Cost of Doing Business in DeFi'" . . . and "visited a news article describing a $10 million bounty that a cryptocurrency bridging platform had paid.").

Ultimately, Shakeeb decided that he would return a majority of the crypto tokens, but keep a customary and legitimate bug bounty—which was something he himself had paid to hackers in his role at Amazon.  On July 7, 2022, the Crypto Exchange reached out to Shakeeb again, this time offering a $1.3 million bug bounty.  Shakeeb responded that he would take $1.5 million, and in exchange, provide the Crypto Exchange with information on the vulnerabilities in its code.  The

Crypto Exchange agreed.  The same day, Shakeeb returned all but approximately $1.5 million of the crypto tokens to the Crypto Exchange, and in exchange, Shakeeb provided the Crypto Exchange with information on the technical vulnerabilities that he had discovered in the Crypto Exchange's smart contract, and suggested potential repairs.  *Id*. at ¶¶ 25–28, 51.

Shortly after the Crypto Exchange hack and while continuing to suffer from severe depression, Shakeeb thought he discovered another vulnerability in the code of another closed-source protocol, Nirvana Finance ("Nirvana"), which according to Nirvana, purportedly was not subject to collapse.[2]  In May 2022, Nirvana reported publicly that the value of its reserves had increased to over $13 million, much of which was held in its own token, NIRV, which was valued at $1.  In his depressed state of mind, Shakeeb again saw the possible vulnerability as a challenge. On July 28, 2022, hours after discovering the vulnerability, Shakeeb used a method similar to the method he used with the Crypto Exchange, to hack Nirvana and obtain approximately $3,600,000 worth of crypto tokens.  PSR at ¶ 34.  This amount was less than a third of the crypto tokens that Nirvana represented it had in its reserves.

After the Nirvana hack, there were reports that Nirvana had collapsed and that, contrary to Nirvana's previous representations to the public, the approximately $3,600,000 represented all of the crypto tokens Nirvana had.  PSR at ¶ 36.  Although Nirvana also offered Shakeeb a bug bounty, and Shakeeb initially planned to return most of the crypto tokens, and keep only a bug bounty, Shakeeb panicked because the repercussions from the Nirvana hack were not what he expected. For example on August 8 and 9, 2022, he researched "are flash loan attacks illegal" and "how often defi hack return funds."  The press articles and online commentary highlighted that what Shakeeb

---

[2]    Nirvana, *Can Nirvana Collapse?*, Medium.com (May 16, 2022), *available at* https://medium.com/nirvanafinance/can-nirvana-collapse-ebd09dcd85bb.

had done was a crime.  He felt lonely, isolated, paralyzed with fear, and afraid of getting caught if he returned any of the crypto tokens.

In February 2023, Shakeeb began seeing Ms. Doshi, a trauma-informed psychotherapist, once per week to seek help for his severe depression, and to help him understand the basis for his actions.  Ms. Doshi reports that her work with Shakeeb "has focused on his history of paternal pressures and demands; the impact of his father's abuse and mother's neglect . . . the deep responsibility he feels to financially support his siblings; and the extreme demands to be financially wealthy and successful."  Therapist Doshi Ltr. at 2–3, Ex. A-5.

Since August 2023, Shakeeb has worked steadily as an independent technology consultant for a healthcare startup company, located in Massachusetts, which has developed a biosensor platform that allows it to track and measure brain health and generate prospective insights regarding how patients respond to medication, their diagnosis, and illness severity.  These metrics allow providers to better understand patient conditions, measure progress, and improve outcomes.  Having experienced the devastating consequences of leaving depression untreated, Shakeeb aspires to have a career in healthcare technology and to help people like himself get access to the right treatment, as quickly as possible

## III.   THE OFFENSE CONDUCT

On December 14, 2023, Shakeeb pleaded guilty to a one-count felony superseding Information under §§ 18 U.S.C. 1030(a)(4), 1030(c)(3)(A), and 2 (Computer Fraud – Unauthorized Access to a Protected Computer to Further Intended Fraud) for fraudulently obtaining approximately $9 million worth of crypto tokens from the Crypto Exchange, a decentralized cryptocurrency exchange, on July 2, 2022.  PSR at ¶¶ 1, 3.

In addition to the conduct charged in the superseding information, after Shakeeb's arrest in relation to the Crypto Exchange attack, Shakeeb voluntarily disclosed to the government that

on July 28, 2022, he committed a second attack on Nirvana, another decentralized cryptocurrency exchange.  *Id*. at ¶¶ 33–34.

## IV.   THE PRESENTENCE REPORT'S ADVISORY GUIDELINES CALCULATION AND BELOW-GUIDELINES RECOMMENDATION

Probation calculates Shakeeb's total offense level as 27, with a criminal history category of I, yielding a Sentencing Guidelines range as 70 to 87 months imprisonment.  PSR at ¶ 110.  Pursuant to §§ 18 U.S.C. 1030(a)(4) and 1030(c)(3)(A), however, the statutorily authorized maximum term of imprisonment is five years.  *Id*.  Therefore, the Guidelines range is 60 months imprisonment, pursuant to § 5G1.1(a).  *Id*.  This calculation is consistent with the Sentencing Guidelines range included in the Plea Agreement.  *See* PSR at ¶ 3(h).

However, Probation "believes a **significant variance below the applicable guideline range is warranted**," and **recommends 24 months imprisonment, with two years of supervised release**.  PSR at 34–35 (emphasis added).  Probation points to a number of justifications for the downward variance, including that

> Ahmed is a first-time offender who committed the offense at age 32.  He is a college graduate who appears to have a steady employment history.  The defendant has a marketable skill set that will allow him to obtain work despite his felon conviction.  He is single, and he has no children.  Ahmed has a support network consisting of his family members, with three of siblings residing in the U.S., and his girlfriend, Zoe Kirsch.  Based on these factors, the defendant appears to pose a low risk of recidivism.  Additionally, Ahmed has transferred cryptocurrency and cash to the Government that should fully satisfy the restitution amount owed to the two victim-companies."

*Id*. at 35.

As to restitution, Probation concludes that restitution is mandatory in this case, pursuant to § 18 U.S.C. 3663A, and should be ordered in the total amount of $5,071,074.23.  PSR at ¶ 120.  Of this amount, $3,571,074.23 is owed to Nirvana, and $1,500,000.00 is owed to the Crypto Exchange.  *Id*.  On December 21, 2023, January 24, 2024, and March 6, 2024, Shakeeb worked

with the Federal Bureau of Investigation to transfer all of the crypto tokens he obtained from the Crypto Exchange and Nirvana back to the government. The government indicated that the transferred crypto tokens will be provided to the victim-companies to satisfy the restitution amount in this case. PSR at ¶ 120.

As to forfeiture, Probation concludes that, as stipulated in the Consent Preliminary Order of Forfeiture, entered on January 8, 2024, Dk. No. 34 (the "Consent Order"), (i) Shakeeb agreed "to make a payment to the Government in the amount of $366,000 in United States currency towards the satisfaction of his forfeiture money judgment obligation, on or before the date of the Defendant's sentencing in this case (the "Payment")," and (ii) "[u]pon receipt of the Payment within the Time Period, and the entry of a Final Order of Forfeiture with respect to the Specific Property and Substitute Asset, the Government shall deem the Money Judgment fully satisfied." *Id*. at ¶ 126. Shakeeb also has agreed to forfeit as a substitute asset, pursuant to 21 U.S.C. 853(p), $100,000 in U.S. currency deposited with the Clerk of Court for the Southern District of New York, which secured his personal recognizance bond as a condition of his release in the instant case. *Id*. at 124–125. On March 1, 2024, Mr. Ahmed remitted the Payment, fully satisfying the money judgment. *Id*. at ¶ 104.

Probation further concludes that, based on Shakeeb's reported low net worth, he is unable to remit a fine. *Id*. at ¶ 108.

## V. SENTENCING ANALYSIS

The Sentencing Guidelines are "effectively advisory," *United States v. Booker*, 543 U.S. 220, 245 (2005), and mark only the "starting point and initial benchmark" at sentencing. *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)). Therefore, although sentencing courts must give fair consideration to the Guidelines, they "are not to 'presume that the Guidelines range is reasonable,' and instead they 'must make an

individualized assessment based on the facts presented.'"  *United States v. Thavaraja*, 740 F.3d
253, 259 (2d Cir. 2014) (quoting *Gall*, 552 U.S. at 50).  18 U.S.C. § 3553(a), which provides, in
pertinent part that "[t]he court shall impose a sentence sufficient, but not greater than necessary"
to serve the objectives of sentencing, is the statute that governs this individualized assessment.
Section 3553(a) lists a number of factors, in addition to the Guidelines, to consider in imposing a
sentence, including:

> (1) the nature and circumstances of the offense and the history and characteristics
> of the defendant;
>
> (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense,
> to promote respect for the law, and to provide just punishment for the offense; (B)
> afford adequate deterrence to criminal conduct; (C) to protect the public from
> further crimes of the defendant; and (D) to provide the defendant with needed
> education or vocational training, medical care, or other correctional treatment in the
> most effective manner . .
>
> (3) the kinds of sentences available;….
>
> (6) the need to avoid unwarranted sentencing disparities among defendants with
> similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to the victims of the offense.

*See* 18 U.S.C. § 3553(a)(1)–(3), (6)–(7).

Notwithstanding Probation's recommendation that Shakeeb receive a term of
imprisonment of 24 months, we respectfully submit that—based on the following factors
enumerated in § 3553(a)—the Court should determine that a noncustodial sentence is warranted.

First, applying § 3553(a)(1), the nature and circumstances of the offense warrant a
noncustodial sentence.  The Sentencing Guidelines range overstates the nature and seriousness of
the offense because, with respect to the Crypto Exchange hack, Shakeeb immediately returned all
but $1.5 million of the crypto tokens that he initially took—an amount which, in his mind,
represented a customary and legitimate bug bounty that the Crypto Exchange agreed to pay him.

Shakeeb did not spend any of the crypto tokens that he took from the Crypto Exchange or Nirvana, and he already has returned all of the crypto tokens to the government.   As Probation acknowledges, the fact that Shakeeb did not touch the funds and that full restitution can be made in this case is highly unusual, and sets this case apart from other financial crimes.

Second, also applying § 3553(a)(1), Shakeeb's personal history and characteristics justify a noncustodial sentence.  Shakeeb's extraordinary acceptance of responsibility in this case—which includes not only pleading guilty early, but also disclosing a second hack when there was no indication that the hack was being investigated, and when it appeared that someone else was being wrongly accused—was, as the government has stated, "commendable" and warrants a significant downward variance.   As the numerous letters Shakeeb's family and friends have submitted on his behalf attest, the July 2022 hacks were completely out of character for Shakeeb.  These anomalous events, in an otherwise exemplary and law-abiding life, stemmed from the deep depression and sense of isolation that Shakeeb felt at the time.  Even before his arrest, Shakeeb proactively sought out help for his mental health and substance abuse issues, and he is progressing towards recovery.

Third, applying § 3553(a)(2), a noncustodial sentence reflects the seriousness of the offense and provides just punishment because Shakeeb has suffered and will continue to suffer, a number of collateral consequences as a result of the offense.  A noncustodial sentence will afford adequate general deterrence, because of the now-certainty of a subsequent offender being caught and prosecuted for a similar crime as well as the attendant stiff financial penalties, and will afford adequate specific deterrence because Shakeeb is highly unlikely to recidivate.   A custodial sentence is not needed either to protect the public, or to provide Shakeeb with education or vocational training, medical care, or other correctional treatment.

Fourth, applying § 3553(a)(3), probation is an available sentence in this case.

Fifth, applying § 3553(a)(6), a noncustodial sentence or sentence below the statutory maximum would avoid sentencing discrepancies between Shakeeb and similarly situated defendants, who have received probation or below-Guidelines sentences.

Sixth, applying § 3553(a)(7), Shakeeb already has transferred all of the crypto tokens he took to the government, and the government has represented that those tokens will be returned to the Crypto Exchange and Nirvana.

We respectfully submit that a noncustodial sentence would be sufficient and not greater than necessary under Section 3553(a).

### A.   The Nature and Circumstances of the Offense Justify a Noncustodial Sentence Under Section 3553(a)(1).

Under 18 U.S.C. § 3553(a)(1), the court must consider "the nature and circumstances of the offense." There are two reasons why the nature and circumstances of this atypical offense warrant a significant downward variance. First, although $12,336,749.11 is the agreed-upon loss amount for the purpose of the Plea Agreement, that amount, which includes the total amount Shakeeb initially took from the Crypto Exchange, overstates the seriousness of the offense. With respect to the Crypto Exchange, on July 2, 2022, Shakeeb obtained approximately $9 million in crypto tokens from the cryptocurrency exchange. PSR at ¶ 7. On July 6, 2022, the Crypto Exchange publicly offered an $800,000 bug bounty to the hacker if he returned the crypto tokens. *Id.* at ¶ 27. On July 7, 2022, Shakeeb communicated with the Crypto Exchange and offered to return all but $1.5 million of the crypto tokens in exchange for providing information to the Crypto Exchange about its technical vulnerabilities. The Crypto Exchange agreed, telling Shakeeb over email that "[y]ou can keep the $1.5M bounty." Shakeeb then returned approximately $7.5 million to the Crypto Exchange, and he provided the Crypto Exchange with information about its technical vulnerabilities. Including the full amount initially obtained ($9 million) or even the agreed-upon

bug bounty ($1.5 million), in the loss amount, both overstates the amount of crypto tokens of which the Crypto Exchange was deprived, and disregards that the Crypto Exchange agreed to the $1.5 million that Shakeeb kept as a legitimate bug bounty.  *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence.").

Second, after Shakeeb pleaded guilty and long before sentencing, he voluntarily returned all of the crypto tokens back to the government.  Other cases have treated full reimbursement of funds to victims as a significant mitigating factor.  In *United States v. Zaslavskiy*, No. 17 Cr. 647 (RJD) (RER) (E.D.N.Y. Nov. 18, 2019), a 39 year-old defendant pleaded guilty to conspiracy to commit securities fraud in connection with two Initial Coin Offerings, with a Guidelines range of 30–37 months imprisonment.   In imposing a below-Guidelines sentence of 18 months imprisonment, the Court took into account "importantly . . . the fact that these victims have been made whole."  The Court stated that "[t]here is something to be said for the fact that these victims got their money back."  *Id*. at 5.  The Court continued, "**[t]he fact of the matter is that people got their money back, and in my many years of experience in these financial crimes, that doesn't happen very often. It doesn't happen very often at all**." *Id*. at 18–19 (emphasis added). Courts even have considered repayment of only a *portion* of funds to be a mitigating factor.  In *United States v. Rodriguez*, No. 20 Cr 398 (GBD) (S.D.N.Y. 2023), which involved a cryptocurrency Ponzi scheme, the Court, when imposing a below-Guidelines sentence, stated, "I believe that the defendant deserves some mitigating credit for his post arrest conduct and the conditions of confinement and to the extent that he has assisted in recovering a portion of victims' funds and acceptance of responsibility for his crime represented by his guilty plea and the moneys

that were turned over to the government."  Dkt No. 271 at 66; *see also United States v. Mitrow*, No. 13 Cr. 633 (PAE), 2015 WL 5245281, at *10 (S.D.N.Y. Sept. 8, 2015) (stating in dicta that the defendant's substantial repayment to customers "reflects favorably on [defendant] and is relevant under § 3553(a).").  Here, Probation similarly considers the return of all of the crypto tokens back to the government to be a significant mitigating factor, stating that "[i]t is often uncommon for restitution to be made in full in a federal crime case within a short time period of the imposition of sentencing. In most cases, victims receive only a small portion of the imposed order of restitution, which is paid over an extended time period following sentencing."  PSR at 35.

The court should consider the nature and circumstances of the offense—including that the actual "out-of-pocket" loss to the Crypto Exchange and Nirvana is, at most, $5,071,074.23, rather than $12,336,749.11; that the Crypto Exchange agreed to the bug bounty that Shakeeb kept; and that Shakeeb already has returned the crypto tokens to reimburse the Crypto Exchange and Nirvana in full—as significant mitigating factors warranting a downward variance from the Guidelines range and a noncustodial sentence.

> **B.     Shakeeb's Personal History and Characteristics Justify a Noncustodial Sentence Under Section 3553(a)(1).**

Under 18 U.S.C. § 3553(a)(1), the court also must consider "the history and characteristics of the defendant[.]"  A sentencing court must consider any and all information relating to the background, character and conduct of the defendant in order to "make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50 ; *see also United States v. Mears*, 758 F. App'x 92, 94 (2d Cir. 2018) (declaring that "it is [h]ighly relevant—if not essential—to [the] selection of an appropriate sentence that [the sentencing court] possess the fullest information possible concerning the defendant's life and characteristics.") (citing *United States v. Broxmeyer*, 699 F.3d 265, 293 (2d Cir. 2012) (internal quotation marks omitted)).

1. <u>Shakeeb's Extraordinary Acceptance of Responsibility, Including His Voluntary Disclosure of the Nirvana Hack Because He Believed Someone Else Was Wrongfully Accused, Warrants a Noncustodial Sentence.</u>

Shakeeb's acceptance of responsibility and cooperation in this case has been extraordinary. Shakeeb voluntarily disclosed the Nirvana hack to the United States Attorney's Office, at a time when there was no indication that office, or any prosecutor's office, was investigating, or even suspected Shakeeb's involvement in, the Nirvana hack. Shakeeb did precisely what we hope someone in his position would do, and his actions are indicative of his deep remorse for the crimes he committed.

At the time Shakeeb disclosed the Nirvana hack to the United States Attorney's Office, Shakeeb believed that the authorities suspected another individual from São Paulo, Brazil of having taken the crypto tokens from Nirvana, and had questioned, and possibly charged, that individual.[3] Shakeeb already had been indicted for the Crypto Exchange hack, and the government had offered Shakeeb a deal to plead guilty to that hack. Although Shakeeb knew that disclosing another hack would result in additional consequences, and could take his favorable plea deal off of the table, Shakeeb voluntarily came forward anyway. As his sister writes, "[h]e has a conscience: he wrestled with the idea that someone else might be made to take the fall for his second hack and ultimately decided to come forward on his own." Zehra Ltr. at 2, Ex. A-2.

The voluntary disclosure of additional criminal conduct when there is no indication that the government even was investigating or aware of the crime, is, as the government stated, "commendable" and warrants a downward variance. A strong parallel to this case is *United States v. Rivera*, 262 F. Supp. 2d 313, 316 (S.D.N.Y. 2003), where the defendant revealed "the remaining

---

[3] See A.V. and His Key Role in The Attack on Nirvana Finance, MIRROR XYZ (Jan. 28, 2023), https://mirror.xyz/0x51a7BD7092A89f0b5E7eE03EA1c4dF465ECF1733/JviEGxfh8micNlHRqYRw2YG73J1lsd4h NZ5aVQNlkN0.

six robberies and accepted the attendant consequences" and there was "**no evidence that either the Government was about to charge him with these additional robberies** or that Mr. Rivera knew that any such additional charges were forthcoming." *Id*. at 316–317 (emphasis added).  The Court concluded that "[e]ven if a departure were not permissible solely pursuant to § 5K2.16 . . . the circumstances surrounding Mr. Rivera's disclosures taken together with the pre-arrest and post-arrest rehabilitation efforts on the record combine to present additional grounds to depart." *Id*. at 316.  The Court also found highly relevant that the defendant understood that disclosing "these activities to the authorities . . . surely . . . would result in criminal proceedings of some sort, particularly in light of the absence of any indication that Mr. Rivera had reason to believe he was a suspect in these crimes." *Id*.; *see also United States v. Petrelli*, 306 F. Supp. 2d 449, 451 (S.D.N.Y. 2004) (stating that "[i]n the PSR, Probation recommended a three-level departure in the offense level from level 19 to 16 based on [the defendant's] extraordinary acceptance of responsibility in disclosing his offense and for making substantial restitution" and adopting the three level downward departure).

      2.   <u>The Two Hacks in July 2022 Were Anomalous Events in an Otherwise Exemplary and Law-Abiding Life.</u>

The fact that a crime was an anomalous or aberrant event in an otherwise law-abiding life can warrant a downward departure, and certainly does so in this case.  *See Petrelli*, 306 F. Supp. 2d at 452 ("Aberrant behavior is defined as a single criminal occurrence or transaction that was committed without significant planning; was of limited duration; and represents a marked deviation by the defendant from an otherwise law-abiding life.") (citation omitted).

The numerous letters submitted by Shakeeb's family and friends demonstrate that the July 2022 hacks were completely anomalous behavior in an otherwise exemplary and law-abiding life.  Shakeeb is a first-time offender with no criminal history.  PSR at ¶¶ 66–71.  As Shakeeb's friend

and former colleague reports, "Shakeeb's actions and demeanor consistently reflect a deep-seated integrity and a profound commitment to ethical conduct."   Rick Ltr. at 2, Ex. A-6; *see also* Therapist Doshi Ltr. at 2, Ex. A-5 ("Until the recent events, Shakeeb's record has been clean."); Letter from Waleed Ahmed ("Waleed Ltr.") at 2, Ex. A-1 ("He is a man who has never faltered in his morals before, and who, with the right support, will never do so again."); Letter from Zoë Kirsch ("Zoë Ltr.") at 2, Ex. A-7 ("Shakeeb's actions from July 2022 shocked me most of all because they just don't align with the man I've gotten to know so well over the last six years."); Charles Ltr. at 1, Ex. A-3 ("I don't remember an instance where Shakeeb has lied or cheated during the time that I've known him.").

Indeed, Shakeeb's character has served as an inspiration to his friends.   One friend shared that:

> Shakeeb has been a pivotal figure in my life . . . His influence is a constant reminder of the virtues I aspire to embody—dignity, morality, curiosity, and honor. It is often said that we are defined by the company we keep.   In choosing to associate with individuals like Shakeeb, I strive to surround myself with exemplars of strong character, whose qualities enrich my life and those around me.

Rick Ltr. at 2, Ex. A-6.  Zoë, Shakeeb's partner, writes that Shakeeb "paid his way through college, and when we lived together during the pandemic, I saw him work tirelessly day in and day out: making meals, mentoring coworkers, running meetings and, in the little free time he had outside of work, honing his skills to become a better employee."   Zoë Ltr. at 2, Ex. A-7; *see also* Letter from Devin Dai, Soup Kitchen Shift Captain, Soup Kitchen & Outreach at Saint Ignatius ("Devin Ltr."), Ex. A-4 ("His reliability is truly commendable.").  Self-sufficient and hard working from a young age, Shakeeb is a reliable, and a hard worker who "doesn't take shortcuts."  Zoë Ltr. at 2, Ex. A-7.

Despite the abuse and neglect Shakeeb suffered as a child, and the difficulties he faced throughout this life, as Zoë observed, Shakeeb "never let any of these experiences harden his heart against the world." *Id.* Those individuals who know Shakeeb consistently described him as a gentle, caring person. His older sister writes that "my earliest memories of him were of a very gentle and mellow child who behaved far more sensibly than others his age." Zehra Ltr. at 1, Ex. A-2. Shakeeb's gentle character carried through to adulthood. Hibah Ltr. at 1, Ex. A-8 ("He is well known for his easy-going, sweet, personable, and gentle nature . . . He gives off a calm and peaceful energy that spreads to everyone around him."); Letter from Valerie Renbaum ("Valerie Ltr.") at 2, Ex. A-9 ("He is a warm, gentle, sweet, nerdy, funny, trustworthy, and dependable man."); Zoë Ltr. at 2, Ex. A-7 ("Shakeeb is one of the gentlest people I know: he doesn't have a malicious bone in his body.").

Shakeeb cares deeply about his friends and family, and has offered unwavering support to them in times of need. For example, Zoë shares how, when she was suffering from a sports injury, Shakeeb "was the first person to arrive at every emergency room visit, caring for me and holding my hand." Zoë Ltr. at 2, Ex. A-7. Shakeeb's younger brother, Waleed, describes Shakeeb's support after Waleed was diagnosed with a rare autoimmune disease in 2017:

> I believe we learn about the character of others when we ourselves are in moments of desperate need. I had the privilege of witnessing Shakeeb's character first hand when I was diagnosed with a rare autoimmune disease, Myalgic Encephalomyelitis, in 2017. During this period of my life, at a moment I experienced deep despair, it was Shakeeb who stood by me . . . [and] made it his most important responsibility to make sure I never felt alone. He told me verbatim, 'I will help you carry the burden of this illness for as long as I am alive, and we will share the weight.' . . . His unwavering support and his promise to help carry the burden of my illness with every possible form of assistance are the truest expressions of his character . . . [and] did more than allow me to thrive—it kept me alive long enough for me to find new meaning in my life as a social work student. It is because of him that I am capable of service to others.

Waleed Ltr. at 1–2, Ex. A-1.  Shakeeb's sister Zehra writes that "I have felt his compassion over the years, typically delivered in the form of deep hugs and offers of financial assistance, when I was facing my own challenges."  Zehra Ltr. at 2, Ex. A-2.

Shakeeb extends love and kindness not only to those closest to him, but to all those around him.  Shakeeb consistently has been described as an asset to the community, and a person who exhibits a genuine concern for helping others and bettering the lives of those around him.  *See, e.g.*, Devin Ltr. , Ex. A-4 (Shakeeb "approaches each task with a sense of responsibility and a genuine desire to make a difference in the lives of those we serve…."); Zoë Ltr. at 3, Ex. A-7 (explaining that Shakeeb has volunteered at "Win NYC, where he has helped distribute holiday gifts to homeless children and coats to their mothers."); Valerie Ltr. at 1, Ex. A-9 ("Shakeeb was friends with everyone and would always go out of his way: helping others move, mentoring his younger colleagues…."); Rick Ltr. at 2, Ex. A-6 ("His presence in any community is undoubtedly a force for positive influence.").

Shakeeb's partner Zoë writes about how Shakeeb's generosity makes him "an active and beloved member of his community[.]"  Zoë describes how, "[d]uring the pandemic, in September 2020, he lent hours of his coding skills to a journalism project [she] was building, a data visualization to show New York City parents and community leaders which schools lacked nurses to care for their students. He has also given money to a Sri Lankan family he knows through his family back home."  Zoë Ltr. at 3, Ex. A-7.  Shakeeb's friend recalls an incident

> during a dinner with colleagues and their partners, when an executive made an inappropriate remark.  Shakeeb, with remarkable poise and respect for all present, addressed the impropriety directly, safeguarding the dignity of those involved.  This action not only demonstrated his courage but also his unwavering commitment to upholding values of respect and integrity, even at personal risk.  This moment was, and continues to be, a powerful reminder that our actions and how we treat others are of paramount importance, inspiring me to hold myself to a higher standard.

Rick Ltr. at 1, Ex. A-6.

*United States v. Harris*, No. 16 Cr. 851 (VSB), 2020 U.S. Dist. LEXIS 145442, at *3 (S.D.N.Y. Aug. 12, 2020) is instructive on the relevance of Shakeeb's character.  The defendant, at 27 years old, pleaded guilty to charges of conspiracy to commit wire fraud in connection with a credit card fraud and identity theft scheme, which involved numerous victims.  The defendant previously had been arrested and convicted of a similar offense in another district.  *Id*. at *1.  "The plea agreement calculated Defendant's Sentencing Guidelines range as 63 to 78 months' imprisonment; however, because the statutory maximum term of imprisonment under Section 371 was 60 months, Defendant's Sentencing Guidelines range was 60 months."  *Id*.  During sentencing, Judge Broderick considered "[t]hat others who have written on your behalf have expressed that they believe that you are, in fact, remorseful and that you're turning a corner based upon the fact that you're gainfully employed and I guess their interactions with you and in the comments that you've made. So I'll consider their views of your character in connection with deciding what an appropriate sentence is for you."  Dk. No. 225 at 29.  After considering the factors contained in 18 U.S.C. § 3553(a), the court sentenced Harris significantly below both the recommendation of the Sentencing Guidelines and the statutory maximum.  *Id*. at *3 (imposing sentence of "38 months imprisonment, three years of supervised release, and order[ing] him to pay approximately $200,412.70 in restitution to the victims of his offense").

The numerous letters from Shakeeb's friends and family speak volumes about Shakeeb's character, and warrant a significant downward variance in this case.  Simply put, the offense conduct was "wildly out-of-character, the lowest point in the life of a man who has otherwise acted with integrity and honor."  Zoë Ltr. at 4, Ex. A-7.  *See United States v. Forrester*, No. 21 Cr 682 (VM) (S.D.N.Y. 2023) (VM), Dk. No. 42 at 10 (for a narcotics trafficking offense, sentencing the

defendant, a postal worker, to five years' probation with two years of home incarceration, where the Guidelines range was 87–108 months imprisonment, given the nature and circumstances of the offense, including that the defendant was a first-time offender, unlikely to recidivate, and due to family circumstances).

The Court should consider Shakeeb's extraordinary acceptance of responsibility, and otherwise exemplary character, as significant mitigating factors that warrant imposing a noncustodial sentence.

### C.   A Custodial Sentence Is Not Necessary To Achieve the Objectives of Section 3553(a)(2).

1.   <u>Applying Section 3553(a)(2)(A), a Noncustodial Sentence Would Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense.</u>

Under 18 U.S.C. § 3553(a)(2)(A), the Court shall consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."   Here, a non-custodial sentence adequately considers the seriousness of the offense based on these unique facts, promotes respect for the law and provides just punishment for the offense.

First, in assessing the seriousness of this offense and just punishment, as described above, the fact that the crypto tokens were untouched and already paid back in full to the two cryptocurrency exchanges is a significant factor that weighs in favor of a noncustodial sentence. *See, e.g.*, *Mitrow*, 2015 WL 5245281, at *10.

Second, in terms of just punishment, Shakeeb stands to lose his livelihood.   Shakeeb likely will never be able to work as a computer security engineer again, which has been his primary interest, focus, passion and source of income for his entire life.   The first thing that anyone, including future employers, will see when they search for Shakeeb's name is that he pleaded guilty

to stealing millions of dollars from two cryptocurrency exchanges.[4]  Although Shakeeb has been working as a consultant for a healthcare startup company, and has found meaning and purpose in this work, he has been earning only $1,500 per month, which, as Probation observes, is not enough to cover his expenses, PSR at ¶ 106, and much less than the market rate for someone with Shakeeb's capabilities.  *See* PSR at ¶ 92 (stating that Shakeeb earned over $33,900 per month as a senior security engineer at Amazon).  This collateral consequence is relevant to the determination of a just sentence.  "It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."  *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (upholding sentence where "[t]he district court found that [the defendant's] conviction made it 'doubtful that the defendant could pursue' his career as an academic or translator, and therefore that the need for further deterrence and protection of the public is lessened because the conviction itself 'already visits substantial punishment on the defendant.'").

Third, in addition to the limitations the conviction will impose upon Shakeeb's ability to earn a living, the conviction already has taken a substantial monetary toll.  Shakeeb is financially ruined.  He already has paid a substantial sum, $366,000, and forfeited his $100,000 bond, towards the satisfaction of the monetary judgment imposed in this case.  Shakeeb owes enormous debts to

---

[4] *See, e.g.*, Katherine Ross, Nirvana Finance hacker pleads guilty, forfeits $12.3M, BLOCKWORKS.COM (Dec. 14, 2023), *available at* https://blockworks.co/news/nirvana-hacker-pleads-guilty; Sergiu Gatlan, Ex-Amazon engineer pleads guilty to hacking crypto exchanges, BLEEPINGCOMPUTER.COM (Dec. 5, 2023), *available at* https://www.bleepingcomputer.com/news/security/ex-amazon-engineer-pleads-guilty-to-hacking-crypto-exchanges/; Mary Whitfill Roeloffs, Feds Charge NYC Man With Hacking Decentralized Crypto Exchange And Stealing $9 Million—In First-Of-Its-Kind Case, FORBES.COM (July 11, 2023), *available at* https://www.forbes.com/sites/maryroeloffs/2023/07/11/feds-charge-nyc-man-with-hacking-decentralized-crypto-exchange-and-stealing-9-million-in-first-of-its-kind-case/?sh=34fbcf53147b; David Marsanic, First Smart Contact Hacker Pleads Guilty to Inside Job, DAILYCOIN.COM (Dec. 18, 2023), *available at* https://dailycoin.com/first-smart-contact-hacker-pleads-guilty-to-inside-job/; Oliver Dale, The Man Who Brought Down Nirvana Finance: Inside the $12M Crypto Heist, BLOCKONOMI.COM (Dec. 15, 2023), *available at* https://blockonomi.com/the-man-who-brought-down-nirvana-finance-inside-the-12m-crypto-heist/; Nikhilesh De, U.S. Department of Justice Arrests Engineer Over $9M Crypto Theft, COINDESK.COM (July 11, 2023) https://www.coindesk.com/policy/2023/07/11/us-department-of-justice-arrests-engineer-over-9m-crypto-theft/

his family and partner, who came forward to loan him money to pay the monetary judgment.  PSR at ¶ 104.  Probation has determined that Shakeeb cannot afford to pay a fine.  PSR at ¶ 103.

> 2. <u>Applying Section 3553(a)(2)(B), a Noncustodial Sentence Would Afford Adequate Deterrence to Criminal Conduct.</u>

Under 18 U.S.C. § 3553(a)(2)(B), an appropriate sentence should "afford adequate deterrence to criminal conduct[.]"

> a.  General Deterrence.

A noncustodial sentence is adequate to generally deter the criminal conduct here for three reasons.  First, "[c]urrent empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, 'increases in severity of punishments do not yield significant (if any) marginal deterrent effects.'"  *United States v. Velazquez*, No. 16 Cr. 233 (AKH), 2017 WL 2782037, at *4 (S.D.N.Y. May 26, 2017) (citation omitted); *see also United States v. Bannister*, 786 F. Supp. 2d 617, 660 (E.D.N.Y. 2011) (It "appears to be primarily in the certainty of punishment, not its severity, that deterrent power lies.")

This case is the first criminal case involving an attack on a smart contract operated by decentralized exchange.  Despite the novel nature of the crime, following Shakeeb's arrest and conviction, the message from law enforcement was clear:  If you hack, no matter how sophisticated the means, white hat bounty or not, we will catch and prosecute you.  In the press release announcing Shakeeb's guilty plea, United States Attorney Damian Williams was quoted as stating that "[t]oday's conviction shows that *no matter how sophisticated the methods used*, fraud is fraud, and *we will swiftly catch and convict you*."[5]  When Shakeeb was arrested in July 2023, Mr.

---

[5] Press Release, U.S. Attorney's Office, Southern District of New York, *Shakeeb Ahmed Admits to Hacking Nirvana Finance and Another Decentralized Cryptocurrency Exchange in First Ever Conviction for the Hack of a Smart Contract* (Dec. 14, 2023) (emphasis added), *available at* https://www.justice.gov/usao-sdny/pr/former-security-engineer-international-technology-company-pleads-guilty-hacking-two.

Williams similarly stated that "none of those actions covered the defendant's tracks or fooled law enforcement, and *they certainly didn't stop my Office or our law enforcement partners from following the money*."[6] IRS-CI Special Agent in Charge Tyler Hatcher said:

> As alleged, Mr. Ahmed used his skills as a computer security engineer to steal millions of dollars. He then allegedly tried to hide the stolen funds, but *his skills were no match for IRS Criminal Investigation's Cyber Crimes Unit*. We, along with our partners at HSI and the Department of Justice, *are at the forefront of cyber investigations and will track these fraudsters anywhere they try to hide and hold them accountable*.[7]

Where deterrence may not have existed before, it does now. The certainty of being caught for conducting a similar crime is clear, and any punishment—noncustodial included—is sufficient to deter similar crimes.

Second, the significant financial penalties Shakeeb has faced are sufficient in and of themselves to promote general deterrence. Courts have imposed noncustodial sentences in cases, like this one, where the financial penalties are high. For example in *United States v. McCarthy*, the defendant pleaded guilty to failure to pay employment taxes, which carried a Guidelines range of 24–30 months imprisonment. No. 22 Cr. 491 (NRM), 2023 WL 3741996, at *1 (E.D.N.Y. May 30, 2023). In imposing a noncustodial sentence, the court found that "[t]he goals of general deterrence and just punishment are served by this sentence: the offense has had a ruinous impact on Mr. McCarthy's life, and he is now subject to a very significant financial penalty." *Id*. at *3. The court also considered that due to the defendant's "lack of criminal history, his early and complete cooperation, and his expressions of shame and remorse, any term of incarceration would be far greater punishment than is necessary to achieve this end." *Id*.; *see also United States v.*

---

[6] Press Release, U.S. Attorney's Office, Southern District of New York, *First Criminal Case Involving Attack on a Smart Contract Operated by Decentralized Exchange* (Jul. 11, 2023) (emphasis added), *available at* https://www.justice.gov/usao-sdny/pr/former-security-engineer-international-technology-company-arrested-defrauding.

[7] *Id*.

*Alatsas*, No. 06 Cr. 473 (JBW), 2008 WL 238559, at *2 (E.D.N.Y. Jan. 16, 2008) (concluding that, in a loan application fraud case with a Guidelines range of 24 to 30 months, "[g]eneral deterrence is also sufficiently satisfied by . . . [t]hree years' probation plus full restitution"); *United States v. Villella*, No. 07 Cr. 287 (RWS), 2007 U.S. Dist. LEXIS 72712, at *13 (S.D.N.Y. Sep. 25, 2007) (determining that a probationary sentence plus an above-minimum fine, restitution and community service and some additional financial restrictions were "sufficient but not greater than necessary to provide just punishment for this particular offense as well as adequate deterrence and protection of the public, pursuant to § 3553(a)(2)").

Third, "[d]eterrence can be a double-edged sword and the Court is mindful that just as sentencing should be designed to deter criminal behavior, it should also avoid deterring cooperation." *United States v. Doe*, 323 F. Supp. 3d 368, 390 (E.D.N.Y. 2018) (citation omitted); *see also United States v. Hendrix*, 505 F.2d 1233, 1236 (2d Cir. 1974) ("On the other side of the scale, most sentencing judges would probably acknowledge a disposition to encourage 'cooperation'—truth-telling to aid law enforcement—by considering it a factor in defendant's favor."). Here, Shakeeb came forward with not only the fact of, but also the proceeds from, the Nirvana hack. Particularly in cryptocurrency-related cases where proceeds can be difficult to track and recover, a significant downward variance will encourage others to come forward and cooperate as Shakeeb has.

  b.  Specific Deterrence.

A custodial sentence is not necessary to deter Shakeeb from committing further crimes for three reasons. First, the conviction has cost Shakeeb, and will continue to cost him, not only financially, as described above, but emotionally. Shakeeb's remorse for the crimes he committed is deep and genuine. Ms. Doshi, Shakeeb's therapist, writes that "[s]ince the indictment . . . he has

exhibited deep remorse and sadness for his actions . . . His decision to plead guilty shows his remorse and acceptance of the consequences of his actions." Therapist Doshi Ltr. at 2–3, Ex. A-5. Shakeeb's younger brother, Waleed, has described Shakeeb's immense remorse, writing:

> Since the incidents that brought us here today I have been in daily communication with Shakeeb, witnessing firsthand a remorse so profound that it transcends mere regret. The depths of self-realization and guilt that have emerged from these events go so deep that they have shaken the very core of his being. I can tell you that I don't know how to quantify remorse, but I know in my heart that if there is any measure of remorse, it's what I've seen in Shakeeb's eyes every day that I have communicated with him, it cannot be faked. He is acutely aware of his mistakes and is committed to a path of rehabilitation—a path that we, as a family, are dedicated to ensuring he follows.

Waleed Ltr. at 1, Ex. A-1. Shakeeb's indisputable remorse for the mistakes he committed, including pleading guilty, voluntarily admitting to a second hack and returning all of the crypto tokens, demonstrates that incarceration is unnecessary to specifically deter Shakeeb from committing further crimes.

Second, the offense conduct stemmed from Shakeeb's mental health issues, but Shakeeb proactively has worked hard to better himself. As described by Shakeeb's family and friends, Shakeeb had a history of retreating inwardly during periods of stress, isolation and depression, and had a difficult time reaching out to others for help. July 2022 was one of those periods for Shakeeb. The offense conduct, as described above, was completely out of character for Shakeeb, and stemmed from his deep feelings of isolation and depression following years of remote work and COVID lockdowns. Shakeeb's sister, Zehra, writes that "[b]y July 2022, he was burned out and on the verge of dropping out of the workforce. His actions that month may have stemmed from more than one place, but from what I have observed, they were motivated in large part by exhaustion, numbness, and a pervasive lack of support." Zehra Ltr. at 2, Ex. A-2; *see also* Waleed

Ltr. at 2, Ex. A-1 ("Shakeeb's actions, as inexcusable as they are, stemmed from isolation and disconnection. He was, to put it simply, deeply lonely.").

Well before Shakeeb was arrested, Shakeeb had the self-awareness to recognize that he needed to seek professional help for his mental health issues and his dependence on substances to cope with stress.  Shakeeb consistently has been described by those who know him as a self-reflective person who, constantly was striving to better himself.  *See* Rick Ltr. at 2, Ex. A-6 ("Fresh out of school and navigating the complexities of a demanding workplace, I found in Shakeeb a mentor who emphasized the importance of balance—encouraging the nurturing of personal relationships and self-care amidst our rigorous schedules."); Zoë Ltr. at 4 ("He is a self-reflective, hardworking person who is constantly searching for ways to better himself…."). To that end, in February 2023, Shakeeb began seeing a therapist, Priti M. Doshi, once a week, and has continued seeing her on a weekly basis ever since.  As Ms. Doshi writes,

> Shakeeb is clearly invested in continuing to understand and unpack what led him to commit these crimes.  Our work together has focused on his history of paternal pressures and demands; the impact of his father's abuse and mother's neglect . . . the deep responsibility he feels to financially support his siblings; and the extreme demands to be financially wealthy and successful.  All of this contributed to Shakeeb's criminal activity."

Therapist Doshi Ltr. at 2-3, Ex. A-5. To aid in his mental health recovery and to reconnect with a core value, that is, being of service to others, Shakeeb has been volunteering at the Soup Kitchen & Outreach at Saint Ignatius in Manhattan.  Shakeeb's Soup Kitchen Shift Captain, Devin Dai, has stated that Shakeeb is "exemplary" and "has been an invaluable asset to [the] team."  Devin Ltr., Ex. A-4.

Third, Shakeeb is a first-time offender and the hacks were isolated incidents during a low point in his life.  Shakeeb has abided scrupulously by the conditions of his pretrial supervision since his release on bail on July 11, 2023, PSR ¶ at 4, which included a curfew set by the Pretrial

Services Office, GPS Monitoring, and travel restricted to the Southern and Eastern District of New York.   Indeed, due to Shakeeb's compliance, on January 22, 2024, with the consent of the government and the Office of Pretrial Services, the Court ordered that both the curfew and electronic monitoring conditions be removed.   Dk. No. 36.

In short, sentencing Shakeeb to probation, even with a period of home confinement and community service, in addition to the significant monetary penalties Shakeeb already has paid, sends a clear message to Shakeeb specifically and society generally not to repeat his mistakes.

      3.  <u>Applying Section 3553(a)(2)(C), a Custodial Sentence Is Unnecessary To Protect the Public.</u>

Under 18 U.S.C. § 3553(a)(2)(C), an appropriate sentence shall "protect the public from further crimes of the defendant[.]"   The "likelihood that [the defendant] will engage in future criminal conduct" is "a central factor that sentencing courts must consider."   *Pepper v. United States*, 562 U.S. 476, 131 S. Ct. 1229, 1234, 179 L. Ed. 2d 196 (2011).   Shakeeb is a first-time, non-violent offender, and the conduct at issue is anomalous in his otherwise spotless life.   He is highly unlikely to offend again, and incarceration is not necessary to protect society from Shakeeb.   *See* Valerie Ltr. at 2, Ex. A-9 ("I believe Shakeeb to be the type of individual who will not repeat his mistakes."); Therapist Doshi Ltr. at 3, Ex. A-5 ("I do not see any concern for recidivism.").   In recommending a sentence of 24 months, Probation states that Shakeeb "appears to pose a low risk of recidivism."   PSR at 35.   Because Shakeeb is unlikely to recidivate, and poses no threat to the public, a noncustodial sentence is sufficient.

      4.  <u>Applying Section 3553(a)(2)(D), a Noncustodial Sentence Would Provide Shakeeb With Needed Mental Health Care.</u>

Under 18 U.S.C. § 3553(a)(2)(D), the court shall consider "the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]"   Shakeeb needs no educational or

vocational training.  Shakeeb does not need to be incarcerated to receive rehabilitative treatment. To the contrary, incarceration will hinder the rehabilitative progress he has made over the last 14 months.

Shakeeb would benefit most from continuity of care for his mental health and substance abuse issues with Ms. Doshi, the therapist with whom he has built a level of security and trust.  As Ms. Doshi writes, she is concerned about disrupting the progress Shakeeb has made in therapy and that "continuity of care by a trusted other is key to Shakeeb's recovery."  Therapist Doshi Ltr. at 3, Ex. A-5.  Ms. Doshi recognizes that "Shakeeb has empathy and a lot of potential to grow from this experience," and in her professional experience, believes that "disruption of treatment often negatively impacts the potential for healing, growth and recovery."  *Id*.  Ms. Doshi also believes that "Shakeeb would highly benefit from his continued engagement with his volunteer work and access to his support system to maximize his rehabilitation."  *Id*;  *see also* Waleed Ltr. at 2, Ex. A-1 ("Further isolation within the prison system would only hinder his progress, moving him away from the rehabilitation he desperately needs and that we as his family members are fully committed to supporting.").

Furthermore, Shakeeb has strong support from family and friends who have been supportive of, and will continue to support, his rehabilitation.  *See id*. ("This incident has indeed brought our family closer, instilling in us a collective resolve to support Shakeeb through his journey toward redemption."); Zehra Ltr. at 2, Ex. A-2 ("I know that once we help him heal, far more cheaply and effectively than the justice system ever could, Shakeeb will be a tremendous asset to society."); Zoë Ltr. at 3 ("He and his siblings are close, and they care for one another."); PSR at 35 ("Ahmed has a support network consisting of his family members, with three of siblings residing in the U.S., and his girlfriend, Zoe Kirsch.").

### D.     A Non-Custodial Sentence Is Available Under 18 U.S.C. § 3553(a)(3).

Under 18 U.S.C. § 3553(a)(3), the court shall consider "the kinds of sentences available[.]"
Here, the PSR sets forth in detail the kinds of sentences available in this case, which includes a
term of probation of not less than 1 nor more than 5 years.  *See* PSR ¶¶ 109–127.  Shakeeb
respectfully directs the Court's attention to that discussion.  As discussed above, Shakeeb already
has satisfied his restitution and forfeiture obligations.

### E.     A Noncustodial Sentence Would Avoid Unwarranted Sentencing Disparities Under Section 3553 (a)(6).

Under 18 U.S.C. § 3553(a)(6), the Court must consider "the need to avoid unwarranted
sentence disparities among defendants with similar records who have been found guilty of similar
conduct[.]"  The case law is clear: To prevent sentence disparities, Shakeeb should get a
noncustodial sentence.

In *United States v. Thompson*, No. 19 Cr. 959 (RSL) (W.D. Wash. 2022), the defendant
was found guilty of wire fraud and multiple computer hacking counts under 18 U.S.C. § 1030, and
received a sentence of time served for wire fraud, and **probation and community service for the
computer hacking counts**, despite a Guidelines range of **168 to 210 months**, and the
government's request for a sentence of seven years' imprisonment.  Dkt. No. 390 at 54, 49, 17.
The defendant was responsible for the second largest data breach in U.S. history, scanning or
probing computers belonging to 37 million different entities.  Dkt. No. 390 at 17, 18.  The
defendant received a 22-point enhancement for a loss above $25 million.  Dk. 377 at 13.  One of
those entity-victims, CapitalOne, was forced to pay over $250 million to settle customer data
breach claims with bank regulators and customers.  Dkt. No. 390 at 18.  The government argued
that, for victims like CapitalOne, the "breach was particularly harmful, because they build their
reputation, they build their business on the fact that they secure data.  And it was embarrassing for

them that they, themselves, had been victims of a breach." Dkt. No. 390 at 21.  The government also argued that the defendant showed no remorse because she bragged about the hack online. Although the defendant stated that she performed the hack because she was in an "unstable situation" and "not receiving appropriate treatment," the defendant broke several conditions of her pretrial release, including as recently as two weeks before sentencing.  Dk. 390 at 33–34.

In imposing the sentence of probation, the judge considered that the defendant had Autism Spectrum Disorder, and as a transgender individual, had suffered trauma "suffered as a child, and suffered into her teens and young adulthood."  The court also stated that it was unlikely that the defendant would reoffend.  Dkt No. 390 at 58.  A sentence of probation is even clearer in Shakeeb's case.  Not only are the Guidelines range and loss amount exponentially lower in this case, but here, there are a number of mitigating factors present that were absent in *Thompson*.  For example, Shakeeb has shown demonstrable remorse by reimbursing the cryptocurrency exchanges in full and by voluntarily disclosing another hack.  Like *Thompson*, Shakeeb also experienced significant childhood trauma, and is unlikely to reoffend.  Shakeeb similarly should receive a noncustodial sentence.

Shakeeb's conduct also is comparable to the defendant in *United States v. Zhong*, No. 22 Cr. 606 (PGG) (S.D.N.Y. 2023), where the defendant pleaded guilty to unlawfully obtaining over 50,000 Bitcoins from the Silk Road internet marketplace, ten years prior, valued at over $3.36 billion.[8]  The seizure was then the largest cryptocurrency seizure in the history of the U.S. Department of Justice and, at the time, was the second largest financial seizure ever.[9]  Mr. Zhong,

---

[8] Press Release, U.S. Attorney Announces Historic $3.36 Billion Cryptocurrency Seizure And Conviction In Connection With Silk Road Dark Web Fraud, U.S. Attorney's Office, Southern District of New York (Nov. 7, 2022), *available at* https://www.justice.gov/usao-sdny/pr/us-attorney-announces-historic-336-billion-cryptocurrency-seizure-and-conviction.

[9] *Id.*

was sentenced to **one year in prison**, Dkt. No. 36 at 51, where the Guidelines range was **27–33 months** and despite probation's and the government's recommendation of 24 months imprisonment. Dkt. No. 36 at 50, 35. In imposing the below-Guidelines sentence, Judge Gardephe credited, among other factors, that the defendant helped the government recover Bitcoin he obtained from hacking the Silk Road exchange after those assets were seized. Dkt. No. 36 at 50. Likewise, Shakeeb has cooperated with the government in recovering all of the crypto tokens that he took.

There are additional mitigating circumstances present in Shakeeb's case which were not present in *Zhong*, and which warrant an even further downward departure and a noncustodial sentence.

- <u>First</u>, the government stated in its sentencing memoranda that a custodial sentence was needed to promote specific deterrence because, "in the 51 months before law enforcement's overt search of Zhong's residences, Zhong dissipated approximately $16 million of crime proceeds, spending lavishly on real estate investments, luxury products, travel, hotels, nightclubs, and other expenses." Dk. No. 32 at 3. Unlike Zhong, besides for the small amount he used to pay for his sibling's medical procedure, and the approximately $10,000 which Shakeeb used as collateral for a loan, Shakeeb did not spend or touch any of the crypto tokens, and he certainly did not use the crypto tokens to sustain an opulent lifestyle. As Probation observes, Shakeeb has lived in the same 500-square-foot studio apartment for the last six years. PSR at ¶ 79.

- <u>Second</u>, also as to specific deterrence and to promote respect for the law, the government argued that Zhong showed little remorse for the crime he committed,

stating that Zhong made numerous posts on social media flaunting his lavish lifestyle (funded by the crime proceeds) and misrepresenting the source of his wealth, telling others to "get a job."  Dk. No. 32 at 31-32.  As discussed above, Shakeeb has exhibited deep remorse for his actions.

- Third, although the government credited Zhong for his assistance in accessing the stolen Bitcoin, the government also stated that "Zhong did not voluntarily turn the Silk Road Bitcoin over to law enforcement. Rather, law enforcement seized it pursuant to search warrants."  *Id*. at 29–30.  In contrast, with respect to Nirvana, Shakeeb voluntarily disclosed the conduct and voluntarily turned over the proceeds, even though there was no indication the Government even was aware that hack had occurred.

- Fourth, unlike Shakeeb, Zhong had a criminal history, a "2014 DUI (alcohol) conviction in Athens, Georgia and his expunged cocaine possession deferred disposition also in Athens, Georgia."[10]  *Id*. at 22.

The court may also consider cases that are helpful not by *similarity* but by *contrast*.  For example, in *United States v. Qin*, No. 21 Cr. 75 (VEC) (S.D.N.Y. 2021), the defendant, Mr. Qin, pleaded guilty to orchestrating a cryptocurrency Ponzi scheme that stole $65 million from victims.  Dkt. No. 36 at 12.  Although the Guidelines range was 151 to 188 months (12.5 to 15.6 years), Mr. Qin, received a sentence of **seven and a half years, well below the low end of the Guidelines range**.  Dkt. No. 36 at 32.  In that case, Mr. Qin diverted millions of dollars to personal expenses, including hundreds of thousands of dollars to pay rent for a luxury apartment in New York City, and hundreds of thousands of dollars spent on partying and lavish entertainment.  Dkt. No. 22. at

---

[10] Despite the previous criminal conduct, the parties agreed that the defendant's criminal history category was I.  *See* Dk. No. 32 at 22.

2. Mr. Qin repeatedly lied to investors over a multi-year period. Dkt. No. 36 at 27. There were over 25 victims, and at least five victims submitted victim impact statements that they had  lost their life savings, had to mortgage their respective homes, or had lost education savings for their children as a result of Mr. Qin's fraud. Dkt. No. 36 at 6.

Judge Caproni concluded there was a severe financial hardship to these victims. Dkt. No. 36 at 6. Moreover, a court-appointed receiver spent funds, time and effort to "unravel the fraud" and recoup assets. Dkt. No. 22 at 8. The government speculated the recovered funds would not come close to the $65 million dollar loss, "leaving the victims to have to deal with competing and minimal recoveries and potentially years of disputes." Dkt. No. 22 at 10. In contrast, not only is the actual loss amount much lower in this case, but the two cryptocurrency exchange victims will be fully reimbursed. Also unlike Mr. Qin, Shakeeb did not spend the crypto tokens on a lavish lifestyle, nor did Shakeeb's fraud need to be "unwound." Shakeeb's conduct, although wrongful, was simply not financially motivated. Shakeeb did not go out and spend lavishly. Instead, Shakeeb continued to live in the same, $3,000 per month, 500-square-foot studio apartment where he had been living since September 2017.

Given these facts, and particularly the sentence of probation imposed in *Thompson* in the Western District of Washington, and the one-year sentence imposed in *Zhong,* it would be in the interests of justice to avoid sentencing disparities between similarly situated defendants and to impose on Shakeeb a sentence of probation. *See Forrester*, 21 Cr 682, Dk. No. 42 at 10  (for a narcotics trafficking offense, sentencing the defendant, as postal worker, to five years' probation with two years of home incarceration, where the Guidelines range was 87–108 months imprisonment, to avoid sentencing disparities among similarly situated defendants who received probation).

-36-

**F.      Shakeeb Already Has Satisfied His Restitution Obligations to the Victims Under Section 3553 (a)(7).**

Under 18 U.S.C. § 3553(a)(7), the court shall consider "the need to provide restitution to any victims of the offense."  As described above, Shakeeb already has satisfied his restitution obligation.

## VI.    CONCLUSION

Shakeeb deeply regrets the lapse in judgment in July 2022 that led to the two hacks he committed.  He accepts responsibility and has begun the process of making amends for his misconduct by admitting to the second hack, accepting responsibility for his crimes, cooperating with the government, and returning all of the crypto tokens to the two exchanges.  Shakeeb has created a strong support system—his therapist, his family, his partner, and his friends—to aid him in his recovery, help heal the parts of him that were broken from his abusive childhood, and ensure that he never falls into the depths of depression again.  He actively is putting his valuable skills to good use at a healthcare technology start-up, to help others like himself who suffer from mental illness.  Shakeeb's actions, pre- and post-arrest, demonstrate that such a lapse in judgment will not happen again, and he will continue to live a law-abiding life.

Shakeeb appreciates the Court's consideration of this memorandum and all the §3553(a) factors in fashioning an appropriate sentence.  He respectfully submits that a term of probation is a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.  Accordingly, and for the foregoing reasons, Shakeeb respectfully requests that the Court impose a term of probation.

Dated: New York, New York
      April 1, 2024

Respectfully submitted,

By: /s/ Bradley J. Bondi
Bradley J. Bondi
Sara E. Ortiz
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 318-6920

*Counsel for Defendant Shakeeb Ahmed*